## SUN OIL CO. v. RED RIVER REFINING CO., Inc.

Circuit Court of Appeals, Seventh Circuit. December 4, 1928.

No. 4042.

George Wharton Pepper, of Philadelphia, Pa., for appellant.

William H. Thompson, of Indianapolis, Ind., for appellee.

Before ALSCHULER, EVANS, and ANDERSON, Circuit Judges.

ALSCHULER, Circuit Judge. The suit was brought for the recovery of royalties under a written contract whereby appellant (called Sun Oil) was licensed by appellee (called Red River) to use Red River's Schulze patent. The appeal is from a judgment for $155,708.68 in favor of appellee.

The contract, dated February 2, 1924, grants Sun Oil a nonexclusive license to manufacture under the patent, within the United States, during the life of the patent; and Sun Oil agrees to pay a royalty of 21 cents a barrel for a maximum monthly average of 10,000 barrels a day, and a minimum, after the first year, of 1,000 barrels, and, after the second year, 2,000 barrels daily, Sun Oil reserving the right to cancel the contract, after the expiration of one year, on three months' notice.

Paragraphs 6 and 12, respecting which the controversy arises, are:

"6. Red River agrees to grant no licenses under said Schulze Patent within one year from the date of the execution of this agreement, provided, however, that it is understood that license agreements have been or may be entered into by Red River with Deepwater Oil Refineries, Inc., to a maximum of six thousand (6,000) barrels of crude per day and with Emery Manufacturing Company, or its assigns, to a maximum of twelve hundred (1,200) barrels of crude per day."

"12. Red River agrees that it will not hereafter grant any license under the Schulze patent or any other patent under which Sun Oil is entitled to operate under this agreement, on terms more favorable in any respect to the licensee than those set forth in this agreement. In the event of failure of Red River to abide by this covenant, Sun Oil may at its option avail itself of such more favorable term or terms of such other license."

The contract was not to be effective until Sun Oil made Red River an advance payment on royalties of $200,000, within ten days after date of contract, and which was, in fact, paid February 6.

Under date of June 24, 1924, Red River and Deepwater Oil Refineries, Inc. (herein called Deepwater), entered into a contract whereby the latter was granted a nonexclusive license under the Schulze patent for its life, to operate in Harris county, Tex., eight stills 8 by 30, having total capacity of 800 barrels daily; the consideration therefor being the discharge of an indebtedness of upwards of $100,000 theretofore owing by Red River to Deepwater.

On October 26, 1926, Red River wrote Sun Oil, advising that the $200,000 advance

828

payment had been liquidated, and asking confirmation of its computations. Sun Oil replied November 1, calling attention to paragraph 12 of its contract, and asking for copies of other license agreements which Red River had made under the patent, to enable Sun Oil to exercise its option if it appeared that another licensee was accorded terms more favorable than those of Sun Oil. The copies were supplied, and the further correspondence resulted in Sun Oil's letter of December 22, 1926, saying that it regarded the Deepwater contract as more favorable to the licensee than the Sun Oil contract, and giving notice of the exercise of the option to accept such more favorable terms.

It is conceded that, if the terms of the Deepwater license were applied to the Sun Oil contract, nothing was due on the latter, and the judgment must be reversed, and that otherwise the judgment must stand.

Sun Oil contends that the contract is clear and unambiguous; that the Deepwater agreement having been made subsequent to the Sun Oil contract, Sun Oil was entitled to exercise its option for the more favorable terms of Deepwater; and that the court erred in admitting evidence to show that, prior to the date of the Sun Oil contract, it was understood between its parties that the Deepwater contract should have no bearing on the operation of paragraph 12.

We do not think that the question here is to be tested by the rules respecting admissibility of prior or contemporaneous writings and conversations not incorporated in a contract.

Paragraph 12, respecting more favorable terms to other licensees, refers only to licenses "hereafter" granted. Had the Deepwater contract antedated that of Sun Oil, its more favorable terms would in no way have been affected by paragraph 12. Whether it was in fact made before, or whether as to the Sun Oil contract it was to be regarded as having been so made before, involves a question of fact to be determined by any evidence bearing thereon, whether coming into existence before or after the Sun Oil contract was made.

■ While the Deepwater agreement bears date of June 24, and the notarial acknowledgment thereon about two months later, the evidence is clear that they were written up in final form as early as February 8; and that, before the Sun Oil contract, Pew, Sun Oil's president, who conducted all the negotiations for Sun Oil, was definitely informed that Red River was morally bound to license Deepwater up to 6,000 barrels daily.

On January 31, 1924, Red River wrote Sun Oil, evidently to give Sun Oil written assurance of facts respecting the license, as follows:

"Confirming our several conversations, the only royalty contracts under the so called Schulze Process heretofore entered into by the Red River Refining Company are one with Deepwater Oil Refineries limited to six thousand (6,000) barrels of crude oil per day and one with Emery Manufacturing Company, Bradford, Pennsylvania, limited to twelve hundred (1,200) barrels of crude oil per day. Neither of these contracts is exclusive and neither limits our right to make any other sort of royalty contracts we may desire.

"The Red River Refining Company is the sole and complete owner of the Schulze Patent and has not conveyed any interest in it, or given any option or any agreement for option covering any interest in this patent other than the royalty contracts above mentioned."

■ This alone would indicate that, for the purposes of the then pending Sun Oil contract, the Deepwater contract was an existing actuality. Paragraph 6 of the Sun Oil contract likewise excepts Deepwater in the words "it is understood that license agreements have been or may be entered into by Red River with Deepwater Oil Refineries, Inc., to a maximum of six thousand barrels of crude per day." In this situation it is immaterial to Sun Oil what the terms of the Deepwater license were or would be, or whether a formal license contract was then or later, or ever, made. The license contract need not be in writing. Cook v. Sterling Electric Co. (C. C. A.) 150 F. 766.

■ It is at least doubtful, in view of the entire contract, whether paragraph 12 refers at all to the first year of the contract.

By paragraph 6 Red River binds itself to grant no other licenses during the first year, so that in that year the only licensees would be Red River, Deepwater, and Emery Manufacturing Company—which was also excluded by paragraph 6. There would thus be no one during that year to whom paragraph 12 might apply. After the first year Red River might grant licenses ad lib.; the only reservation then being that Sun Oil might have the benefit of more favorable terms, if granted to another. We are inclined to the view that paragraph 12 could not be, and was not intended to be, operative until after the first year.

Pew was desirous of eliminating, or at least further restricting, the Deepwater li-

cense; and, upon execution of the Sun Oil contract, Flynn, president of Red River, went to Texas and began negotiating with Deepwater with a view to complying with Pew's desire and reducing Deepwater's maximum output. On February 6, the same date on which payment of the $200,000 was made by Sun Oil, Flynn wired Pew:

"Had tentative conference and now in position to get very close to our understanding twenty five hundred crude may have to go three thousand your thought please."

On February 7 Pew wired Flynn:

"Our expert lawyer on contracts advises me you have no obligation to carry out agreement stop further consideration convinces me of mutual advantage and restricting this process to our two companies believe you will regret having this license outstanding in any event cannot urge too strongly limiting total to two thousand barrels eliminating entirely if possible."

On same date Flynn wired Pew:

"Believe can wipe out our entire indebtedness to Deepwater by giving them use of ten eight by thirty stills thru life of patent further believe this means lower maximum than you and I talked and better for your company and ours Please give me your thought and approval Please do not forget I still have moral obligation to my associates who are Deepwater stockholders."

February 8 Flynn again wired Pew:

"Please answer my wire want to and will keep in line our understanding want your thought on this subject answer quickly."

On the same date Pew wired Flynn:

"Regret delay if necessary best arrangement would be to grant license on a limited number of stills of specified size Suggest five to eight stills size not to exceed eight by thirty."

Thereupon Flynn arranged for a reduction of Deepwater's maximum from the contractual 6,000 to 800 barrels daily, on the very terms stated in Flynn's wire to Pew of the day before. Pew then, if not before, knew of the proposed Deepwater license terms, and, in view of such knowledge, advised their acceptance by Red River.

Of this Pew telegram, it is frankly and fairly stated in brief for appellant:

"If we start with the assumption that Pew when sending the telegram of February 8, 1924, had in mind the rate of royalty arranged between Red River and Deepwater and really caused Red River to make this arrangement, the above arguments appear technical only, and would not command the sympathetic hearing of any Court."

We quite agree. Sun Oil may not thus participate in and advise with Red River in its negotiations with Deepwater for modification of the terms of the Deepwater license agreement, to grant which Pew well knew Red River was morally bound, and then seek advantage of the most favored terms clause in paragraph 12.

Upon this record no theory is apparent whereon disturbance of this judgment would be justified. The judgment is affirmed.